Carvalho v. Homesite Insurance Company
of Pennsylvania

*Robert M. Davison,* for plaintiffs.
*Joseph N. Bongiovanni,* for defendant.

McGINLEY, *J.,* July 15, 2010—Plaintiff Maria Carvalho filed a breach of contract action against Homesite Insurance Company of Pennsylvania to determine if she was improperly denied insurance coverage on a property she owned that was destroyed by vandalism. A nonjury trial was held on August 5, 2009. By decision dated December 21, 2009, an award was entered in favor of plaintiffs and against Homesite in the amount of $127,187.50.[1] On March 31, 2010, Homesite's post-trial motions were denied, and the instant appeal fol-

---

1. Based on the stipulation of counsel, the award was amended to $140,735.26 to include prejudgment interest.

lowed. This opinion is to provide our reasons for denying Homesite's post-trial motions.

## FACTS

Carvalho purchased the property at issue located at 219 West Ridge Street, Lansford, Carbon County, PA 18232 on August 21, 2007. The property required extensive repairs and rehabilitation before it could pass code and be determined habitable. (Joint stipulation, para. 3.) On September 4, 2007, Carvalho executed a contract with Dave's Home Improvement to install drywall and floors, to paint doors, and to make many other improvements for a cost of $19,800. (J.S., para. 10.) On October 4, 2007, Carvalho signed an agreement to have a boiler installed at a cost of $7,000. (J.S., para. 11.) On November 13, 2007, Carvalho signed an agreement with Pierce Electric Company to upgrade the electric service and add smoke detectors for a cost of $7,000. (J.S., para. 12.)

On October 27, 2007, Carvalho's insurance through Nazareth Mutual Insurance Company was denied due to "lack of maintenance." (J.S., para. 6.) Carvalho had represented to Nazareth on August 24, 2007, that the premises was occupied, that her tenant would have liability insurance, that the property was not under or in need of any renovations, repairs, or general maintenance, and that the tenant's name and telephone number would be provided in the future. (J.S., para. 5.) Carvalho testified that there was a mistake with the policy if it stated that the home was occupied and not in need of repairs. (N.T., pp. 35-36.) She further testified that at the time she applied for insurance with Nazareth she intended on renting

the property. (N.T., p. 37.) She subsequently changed her mind and intended on using the home as a second residence that would eventually become her primary residence. (N.T., p. 38.)

Carvalho sought insurance for the property with Homesite and made an oral application for homeowner's insurance on October 30, 2007. (J.S., para. 7.) Carvalho was issued coverage effective October 31, 2007 and the policy was issued. Carvalho agreed to be bound by the terms and conditions of the policy. (J.S., para. 9.)

Subsequent to her application with Homesite, Carvalho sought mortgage financing for the subject property with Ambient Mortgage LLC/plaintiff Flag Star. When the property was used as security, her application was denied. (J.S., para. 14.) Upon subsequent application, she obtained a mortgage in the amount of $48,000. (J.S., para. 15.) Per the loan documents, Carvalho represented that the subject property was an investment property, that a tenant would reside in the premises and obtain insurance, and that all renovations were complete. (J.S., para. 16.) The mortgage documents contain a residential lease executed on November 12, 2007, between Carvalho and tenant Jose Ortiz. (J.S., para. 17.) Carvalho also completed an affidavit of occupancy wherein she represented that the property at issue is an investment property, "Not owner occupied. Purchased as an investment to be held or rented." (J.S., para. 18.)

Carvalho testified, however, that there was never a tenant in the house. (N.T., p. 23.) When asked to explain why she signed a lease if she did not intend on renting the property, she stated:

"I applied for a loan and the bank said that I needed more income. I said, well, I don't have no more income. She said this is only for the bank. I said but I don't have 'em. She said just give me a lease and the bank will loan the money. I said but I don't have any. She said it's only for the bank, you don't got to worry about it. So we made a lease for the bank to loan the money." (N.T. p. 23.)

Carvalho testified that when she first purchased the property she thought about renting it, but after it was fixed up she decided to keep it as a second home because she wanted to move out of Allentown. (N.T., p. 14.) She stated that the property looked really nice after the contractor fixed it and it was a bigger place to live and it is less expensive to live there. (*Id.*)

On December 29, 2007, the property at issue was vandalized, a fire was intentionally set and the fire destroyed the property. (N.T., p. 19.) At the time of the fire, the property was vacant and a certificate of occupancy had not yet been issued, nor had any final inspection taken place. (N.T., p. 20.) Carvalho never resided in the property and never moved any of her personal belongings into the property. (N.T., p. 21.)

After the fire, Carvalho filed a claim with Homesite for the policy proceeds; the request for insurance coverage was denied on March 13, 2008. The house has been condemned and the cost to demolish and haul away the debris was $10,937.50. The cost to replace the home is $143,250. (N.T., p. 25.)

Homesite's 1925(b) statement provided three issues complained of on appeal. First, Homesite asserts that this court erred in denying its motion for post-trial relief

because plaintiffs failed to produce evidence that the subject property constituted a "residence premises". "Residence premises" is defined in part in the policy as "the one family dwelling where you reside and which is shown as the 'residence premises' in the declarations." (Exhibit E.)

Homesite contends that Carvalho is not entitled to coverage because she never resided in the subject property. However, the policy does not define "reside". There is no parameter for the amount of time a homeowner must spend in the property before it is her residence. Carvalho testified that she spent time, albeit limited time,[2] visiting the property prior to the fire, and that she intended on moving personal property into the property so that she could use it as a second residence.

In addition, Carvalho was forthcoming in her oral application for insurance that nobody was living in the house at the time she was requesting insurance. The following conversation took place during the phone application:

"Gwen: And how are you using that second home?

"Ms. Carvalho: Well, right now it's—I have it for the —a family member is going to be living there. They're just going to live there and help me with the—there's going to be—right now there's no mortgage, but I'm thinking about later on. But right now there's no mortgage.

---

2. Carvalho testified that in November of 2007 she went to the property four or five times and in December of 2007 she went to the property four or five times. Each month she had three one-day trips and one weekend-long trip. (N.T., p. 30.)

"Gwen: So, this will be your primary house?

"Ms. Carvalho: No. No. It won't be my primary. I already have a primary . . . .

"Ms. Carvalho: . . . Right now—if anybody's going to be living there it will be not to be rented. . . .

"Gwen: And it will be just your family lives there, if anybody—

"Ms. Carvalho: Yeah.

"Gwen: Right? The total number of people that will be in the house?

"Ms. Carvalho: Right now there will probably only be about three or four." (Pages 2-3, 8, 16-17.)

The policy became effective the day after the oral application was made, at which time the insurance company knew or should have known that nobody was living in the home. The insurance company issued the policy. At the time of the issuance, it was understood by all parties that the subject property would be the "residence premises" even though no one was residing in the home. We find sufficient evidence existed at the time of trial to find that the subject property was the residence premises under the insurance policy at issue.

Secondly, Homesite asserts that this court erred in denying its post-trial motions because the subject property was vacant for 30 consecutive days prior to the fire and the fire was an act of vandalism.

Homesite's insurance policy states in part:

"We insure against risk of direct loss to property described in coverages A and B only if that loss is a

physical loss to the property. We do not insure, however, for loss: . . . (2) Caused by: . . . (d) Vandalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant." (Exhibit E.)

We find that this property is not considered vacant under the above language because it was a dwelling being constructed. Carvalho stipulated that she never lived in the property. In fact, she did not move her belongings into the property because she was waiting for the certificate of occupancy to be issued. There is no evidence that Carvalho did anything to interfere with getting the certificate of occupancy, without which she was not able to fulfill the obligation of keeping the property occupied. She was not asked at the time of her application for insurance if the property had a certificate of occupancy.

Until the issuance of the certificate of occupancy, the property could not be considered vacant. Accordingly, the vandalism exclusion does not apply in this case.

Finally, Homesite asserts that this court erred as a matter of law or abused its discretion in denying its motion for post-trial relief where Carvalho made material misrepresentations about the condition of the property in applying for the policy, and made material misrepresentations about whether she intended to rent the premises.

Homesite's policy provided:

"(2) Concealment or fraud. This entire policy will be void if, whether before or after a loss, an 'insured' has

"(a) Intentionally concealed or misrepresented any material fact or circumstance;

"(b) Engaged in fraudulent conduct; or

"(c) Made false statements; relating to this insurance." (Exhibit E.)

First, Homesite states that it may rescind its policy based on the material misrepresentations made by Carvalho regarding the condition of the property. During the oral application, the following occurred:

"Gwen: Okay. And the wiring, has your electrical been upgraded in the house?

"Ms. Carvalho: I actually just got electric—it just got upgraded just now—

"Gwen: Okay.

"Ms. Carvalho:—from a 60 to a 100 . . . .

"Gwen: Okay. And the heating system, how old is that heater?

"Ms. Carvalho: It's brand new. Just put in about a week ago." (Exhibit D, pp. 22-23.)

Carvalho's trial testimony provided that at the time of the oral application, the new electrical panel was in the property, the electric was on and operating and everything was running. Carvalho believed that the home was habitable at that time because the electricity was on and operating. She spoke with the electrician in October and he started in November; he upgraded the electric from 60 amps to 200 amps and checked where wires went, put more breakers in and added smoke alarms. (N.T., pp. 18-20.)

We find Carvalho credible and find that the information she provided during the phone application was to the best of her knowledge at the time and given in a general manner. We do not find that the answers were intentionally concealed or misrepresented. In addition, we do not find that they were false. Carvalho may have been mistaken as to the timing of some of the repairs, but the repairs were made and she did rehabilitate the house. Therefore, we find that Carvalho did not say or do anything during the insurance application that would allow Homesite to rescind the policy.

Lastly, Homesite argues that Carvalho misrepresented her intentions regarding the use of this home. Again, we find Carvalho's testimony credible. She testified that her original intentions included a possibility of renting the property, but after it was fixed she decided to keep it as a secondary home. (N.T., pp. 14, 38.) It looked really nice, it was bigger and cheaper to live there. (N.T., p. 14.) This is consistent with the information she provided during the oral application. (Exhibit D, pp. 7-8.)

Carvalho did provide a fraudulent rental lease to Ambient Mortgage; however, she testified that she only signed it because the bank had suggested it in order to prove that she had additional income. (N.T., p. 23.) Her testimony is consistent with the fact that her first mortgage application, filed without rental income, was denied. (Exhibit J.) She testified that she never received the security deposit indicated in the lease. (N.T., p. 33.) She had no intention of renting the home to Jose Ortiz, her friend's son. (N.T., p. 34.) We believe her testimony that she ripped up the lease after providing it to the bank and never received any rent money. (N.T., p. 54.)

Carvalho misrepresented herself to the bank, but not to her insurance company. Although we certainly do not condone such action, said misrepresentation did not impact the information provided to her insurance company. She changed her intentions from possibly renting the home to using it as a secondary home. She made her intentions clear during the phone application. The policy, therefore, cannot be rescinded based on any misrepresentation or fraud regarding how Carvalho intended on using the property.

For all of the above reasons, we found that the insurance policy was in place at the time of the fire. The vandalism exclusion did not apply to the facts of this case because Carvalho never had an opportunity to move into the home. Accordingly, Carvalho was entitled to the proceeds of the insurance policy in the stipulated amount of $140,735.26.